Kass Harstad (Bar No. 11012)
1516 W Hays St., Boise, ID 83702
Telephone 208.336.1788
Facsimile 208.287.3708
kass@idahojobjustice.com

Rebecca Holding (NY Bar No. 3984531)
(*Pro Hac Vice Pending)*
HOULDING LAW PC
431 Classon Ave, Suite 1B
Brooklyn, NY 11238
Telephone: (646) 561-9119
Rebecca@houldinglaw.com

*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| **SHARLENE BROWN-JOHNSON,**<br><br>Plaintiff,<br>v.<br><br>**INSTRUCTURE, INC.,**<br><br>Defendant. | **COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br>Case No.: 2:26-CV-783<br><br>Judge: |

## NATURE OF THE CASE

1. This is an action for disability discrimination, failure to accommodate, hostile work environment, and retaliation under the Americans with Disabilities Act of 1990, as amended by the ADA Amendments Act of 2008, 42 U.S.C. § 12101 et seq. (the "ADAAA"), and for interference with rights under the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq. (the "FMLA"), including 29 U.S.C. § 2615. Plaintiff Sharlene Brown-Johnson, who has significant hearing loss, requested reasonable accommodations from her

employer, Defendant Instructure, Inc. Rather than accommodate her, Instructure delayed, refused to engage in the interactive process in good faith, subjected her to a hostile work environment, terminated her employment twice, and retaliated against her for requesting accommodations and for filing charges of discrimination with the Equal Employment Opportunity Commission.

**PARTIES, JURISDICTION, AND VENUE**

2. Plaintiff Sharlene Brown-Johnson is an adult resident of Houston, Harris County, Texas. At all relevant times she was an "employee" of Instructure within the meaning of the ADAAA, 42 U.S.C. § 12111(4), and an "eligible employee" within the meaning of the FMLA, 29 U.S.C. § 2611(2).

3. Ms. Brown-Johnson has a disability within the meaning of the ADAAA, 42 U.S.C. § 12102. She has degenerative hearing loss and other hearing-related conditions that substantially limits the major life activity of hearing. At all relevant times she also had a record of, and was regarded by Instructure as having, such an impairment.

4. At all relevant times, Ms. Brown-Johnson was a "qualified individual" within the meaning of the ADAAA, 42 U.S.C. § 12111(8), in that she could perform the essential functions of her position as an L1 Support Engineer with or without reasonable accommodation.

5. Defendant Instructure, Inc. ("Instructure") is a technology company whose headquarters and principal place of business are located at 6300 South 3000 East, Suite 700, Salt Lake City, Utah 84121. Instructure develops and provides educational software products.

6. Instructure is an "employer" within the meaning of the ADAAA, 42 U.S.C. § 12111(5), and the FMLA, 29 U.S.C. § 2611(4). At all relevant times, Instructure employed more than 500 employees and engaged in an industry affecting commerce.

7. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331, because this action arises under the laws of the United States, and pursuant to 28 U.S.C. § 1343, because it seeks redress for the deprivation of rights secured by federal law.

8. Venue is proper in the District of Utah pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e–5(f)(3), because Instructure's headquarters and principal place of business are located in Salt Lake City, Utah, within this District, and because a substantial part of the events giving rise to Plaintiff's claims—including the decisions to deny Ms. Brown-Johnson's accommodations and to terminate her employment—emanated from Instructure's headquarters within this District.

9. Assignment to the Central Division is proper because Defendant resides in Salt Lake County.

## ADMINISTRATIVE EXHAUSTION

10. On March 20, 2025, Ms. Brown-Johnson timely filed a Charge of Discrimination against Instructure with the Equal Employment Opportunity Commission ("EEOC"), which was assigned Charge No. 460-2025-4277, alleging disability discrimination and retaliation.

11. Ms. Brown-Johnson filed a Supplement to the Charge of Discrimination under the same charge number, verified April 15, 2025, describing Instructure's failure to accommodate her, its hostile treatment of her, and her wrongful termination.

12. Ms. Brown-Johnson filed a further Supplemental Charge of Discrimination under the same charge number, verified October 17, 2025, describing Instructure's continuing retaliation and its September 30, 2025 termination of her employment.

13. Each charge was filed within 300 days of the discriminatory and retaliatory conduct alleged herein. All conditions precedent to suit have been satisfied. The EEOC issued Ms. Brown-Johnson a Notice of Right to Sue dated June 2, 2026, and this action is timely filed within ninety (90) days of her receipt of that notice.

## FACTUAL ALLEGATIONS

### Instructure Employs Ms. Brown-Johnson and She Requests Accommodations for Her Hearing Loss

15. Instructure hired Ms. Brown-Johnson in November 2022 as an L1 Support Engineer. In that role, she assisted schools with technical problems they encounter using Instructure's products.

16. Instructure paid Ms. Brown-Johnson between $21.50 and $25.00 per hour, depending on her shift differential. She received approximately $4,000 to $6,000 per year in company stock grants.

17. Ms. Brown-Johnson was qualified for her position.

18. Ms. Brown-Johnson has hearing loss and is hard of hearing. Her hearing loss substantially limits the major life activity of hearing and she has a disability within the meaning of the ADAAA. She requires the use of captioning and other tools to supplement comprehension because of her hearing loss.

19. In approximately July 2024, Ms. Brown-Johnson requested reasonable accommodations from Instructure due to her hearing loss, specifically software on her computer to assist her with hearing-related tasks.

20. Despite Ms. Brown-Johnson's clear entitlement to the accommodation and the absence of any undue hardship, Instructure required her to escalate her request before it would provide the necessary software.

21. Instructure ultimately provided the requested accommodation, which involves the use of captioning and transcription.

**Ms. Brown-Johnson Uses FMLA Leave and Instructure Fails to Respond to Her Inquiries**

22. Ms. Brown-Johnson began seeking accommodations in May 2024. She required accommodations to assist her with her hearing loss.

23. In September 2024, Ms. Brown-Johnson contacted Instructure's Human Resources department on multiple occasions to ask how much FMLA leave she had available, because she anticipated needing additional medical treatment. Human Resources never responded with the information she requested.

24. In October 2024, Ms. Brown-Johnson applied for, and received approval for, FMLA leave. She began her leave on or about October 17, 2024.

25. In November 2024, Human Resources notified Ms. Brown-Johnson that her leave was available only through December 17, 2024. Ms. Brown-Johnson responded that she had earlier sought to learn her available leave precisely because she still needed treatment. Human Resources never responded.

**Ms. Brown-Johnson Seeks a Shift-Change Accommodation and Instructure Refuses to Engage**

26. On December 17, 2024, Ms. Brown-Johnson was released to return to work with a reasonable accommodation: a change in her work hours to 7:00 a.m. to 3:00 p.m. This accommodation would allow her to continue her medical treatment without taking an additional leave of absence.

27. Human Resources acknowledged receipt of the request, stated that Instructure was reviewing it, and promised to respond. Weeks passed. Ms. Brown-Johnson remained out of work and unpaid.

28. In January 2025, Agnes Kiss, HR Director for Instructure in Hungary, contacted Ms. Brown-Johnson, told her she had no FMLA or sick time remaining, and directed her to return to work. Ms. Brown-Johnson explained that she had already notified Human Resources in December 2024 that she could return with a changed schedule. Director Kiss claimed she was unaware of the accommodation request and stated she would have Ms. Brown-Johnson added to the schedule the next working day.

29. When Ms. Brown-Johnson followed up because she had not been placed on the schedule, Director Kiss claimed that Director of Support Chad Carlson had said the workforce-management department first had to assess the request.

30. Also in January 2025, Lacey Steinman of Instructure's HR North America told Ms. Brown-Johnson that the scheduling accommodation could not be met through FMLA and the request needed to be made as an ADA accommodation request. No one had provided Ms. Brown-Johnson any specific process to follow, even though her request had triggered Instructure's duty to respond under the ADA and to engage in the interactive process. Ms.

Brown-Johnson was forced to request her doctor fill out a new set of paperwork, but she completed the ADA accommodation forms Ms. Steinman sent and submitted them.

31. From January through March 2025, Instructure's scheduling department repeatedly solicited volunteers to work 7:00 a.m. to 3:00 p.m. shifts—the exact hours Ms. Brown-Johnson had requested as an accommodation. During a two-to-three week period, Ms. Brown-Johnson was even able to volunteer for a few of these shifts, totaling approximately 36 hours. The accommodation she sought was plainly available and would have imposed no undue hardship.

32. Despite Ms. Brown-Johnson's mid-December 2024 accommodation request and her formal ADA request in January 2025, Instructure did not respond for months.

**Instructure Terminates Ms. Brown-Johnson**

33. In March 2025, Chad Carlson contacted Ms. Brown-Johnson, ostensibly to discuss her accommodation request. A meeting was scheduled for March 6, 2025, attended by Carlson, Ms. Brown-Johnson's immediate manager Tate Dehaan, and Director Kiss.

34. Technical problems with Ms. Brown-Johnson's captioning and transcription accommodation prevented her from participating fully in the March 6, 2025 meeting; she could not decipher everything being said. Ms. Brown-Johnson explained, both during the meeting and in a follow-up email, that she could not fully participate and asked to reschedule.

35. Instead of rescheduling or engaging in the interactive process required under the ADA, Director Kiss emailed Ms. Brown-Johnson that Instructure would not meet her requested

accommodation and terminated her employment, offering a severance agreement instead of an accommodation.

36. Instructure's stated reason—that the 7:00 a.m. to 3:00 p.m. schedule was unavailable—was false. Ms. Brown-Johnson had received emails from Instructure's own scheduling department soliciting volunteers to work that very schedule.

37. Within minutes of terminating her, Instructure locked Ms. Brown-Johnson out of her email account and locked down her computer, preventing her from sending follow-up communications.

38. On March 9, 2025, Ms. Brown-Johnson attempted to email Instructure's President, legal department, and Human Resources from the personal email address Instructure had on file. Those emails bounced back as undeliverable. She ultimately reached the President and Human Resources from a different email address.

39. Ms. Brown-Johnson emailed HR, identifying an open shift that matched her exact accommodation request, but stating that if her accommodation could not be met, it had taken Instructure so long to evaluate her request that she had obtained much of her medical treatment. She indicated *if need be*, she would continue her original shift. She asked Instructure to explain the protocol, noting her understanding that termination was not the only option when an accommodation purportedly could not be met.

40. On March 13, 2025, Ms. Steinman replied, apologized for the "added stress" and the "process," retracted the severance agreement, and asked when Ms. Brown-Johnson could return to work on her original schedule. Instructure still did not pay Ms. Brown-Johnson for the period during which she had been requesting accommodations, apart from the few

days she worked in response to soliciting volunteers for the schedule she required, nor did Instructure engage in any interactive process to ask about her medical treatment, need for continued accommodation or other alternatives.

41. On or about March 15, 2025, Ms. Brown-Johnson filed a Charge of Discrimination stemming from her illegal termination.

**Instructure Retaliates Against Ms. Brown-Johnson After Her Return**

42. Ms. Brown-Johnson returned to work—technically—on March 26, 2025, but computer issues prevented her from being able to work.

43. On March 27, 2025, Ms. Brown-Johnson met with Chad Carlson and Tate Dehaan, who told her that her first days back would be training only and that Instructure would give her 30 days to get back up to speed before holding her to regular performance standards.

43. It took Ms. Brown-Johnson ten hours on her first day back to make her computer function. Instructure had remotely wiped all her emails and had revoked her access to her payroll and W-2 forms and other systems—access that was not restored, including access to her 2024 W-2 form.

44. Both before and after her initial March 2025 discharge, Tate Dehaan was hostile to Ms. Brown-Johnson because of her disability and her need for the captioning and transcription accommodation. Because of the inherent delay between speech and captioning, Ms. Brown-Johnson would sometimes miss what was said. Dehaan attacked her performance, told her to "stay on top of it," and demanded that she report whenever she missed something due to the transcription—something she often could not know she had missed.

45. Dehaan continued his hostile behavior after Ms. Brown-Johnson's return. For example, he sent her a Slack message claiming that all issues with her laptop had been resolved as of April 1 and that she should have no further performance problems, when in fact—as she showed him with screenshots—her laptop problems persisted.

46. Because of Dehaan's conduct, Ms. Brown-Johnson requested on April 10, 2025, that she receive alternate supervision until her EEOC charge was resolved. Instructure did not respond.

47. On April 15, 2025, Ms. Brown-Johnson filed a supplement to her initial Charge of Discrimination, providing additional detail surrounding her initial discharge as well as noting her request for new supervision due to an ongoing hostile environment.

**Instructure Terminates Ms. Brown-Johnson**
**a Second Time in Retaliation for Her EEOC Charges**

48. After Ms. Brown-Johnson filed her charges of discrimination, Instructure continued to discriminate and retaliate against her—inhibiting her accommodations, micromanaging her, and holding her to different standards than other employees.

49. Ms. Brown-Johnson received the first negative feedback of her career in mid-May 2025, while waiting for additional accommodations, which she had requested and about which she had followed up on at least four times to no avail.

50. Ms. Brown-Johnson sought additional training, and a new manager.

51. The Company eventually transferred her, but even then, it continued to retaliate against her.

52. For example, Instructure had an issue with "rolled calls" – a problem affecting so many employees it distributed a form to fill out when it happened. Rolled calls falsely showed an employee as having declined a call while the employee is in fact on the call.

53. Ms. Brown-Johnson sought help with rolled calls, and Instructure required that she create a screen recording of the problem.

54. Instructure then falsely accused Ms. Brown-Johnson of using the screen-record function to record calls in violation of policy, when in fact, she had done it at the Company's behest.

55. Instructure pretextually used the guise that Ms. Brown-Johnson's captioning tool was "not working" to target her, even though she had never said it was not working. The Company insisted she let them know what transcription App she was using, but Instructure knew the tool was Apple's built-in captioning tool—the very tool Instructure had instructed her to use.

56. Instructure also falsely claimed that Ms. Brown-Johnson intentionally blocked what her captioning tool transcribed during the screen recording, when in fact the screen-record function Instructure told her to use disabled the captioning tool when in use, because both used the same microphone.

57. As part of an investigation into a problem Ms. Brown-Johnson never claimed to have, Instructure questioned Ms. Brown-Johnson about the alleged presence of a VPN on her computer. Ms. Brown-Johnson had not installed a VPN on her computer, shared that her training manager, Parley Bingham, had stated during her training in a one-on-one meeting with her concerning ongoing problems she was experiencing on her computer,

that there was a VPN on her computer that might be making her computer run poorly, and instructed her on how to remove it, which instructions she followed.

58. Instructure conducted a sham investigation into the alleged presence of a VPN on Ms. Brown-Johnson's computer. Ms. Brown-Johnson never claimed that her trainer told all trainees to disable Instructure's own VPN. Rather, during a training session on computer extensions and plug-ins, Ms. Brown-Johnson was unable to install a needed plug-in, screen-shared her computer with her trainer, and her trainer walked her through removing a VPN he identified on her computer. That training session, like Instructure's other training sessions, was recorded and should be in Instructure's possession.

59. Ms. Brown-Johnson never stated, and does not know, whether the VPN her trainer identified and helped her remove was Instructure's own VPN or another VPN, and she never installed a VPN on her computer herself.

60. Instructure initially stated it would send her a replacement computer while it investigated the alleged VPN, then changed direction, telling her she needed to return her computer so it could investigate.

61. After Ms. Brown-Johnson shipped her computer back on September 5, 2025, Instructure claimed to be conducting an investigation and, for over a month, blocked her access to her pay stubs, email, benefits, 401(k), stock plan, and other programs.

62. In its EEOC submissions, Instructure produced a screenshot purporting to show more than 13,000 instances of ExpressVPN usage on Ms. Brown-Johnson's computer. Ms. Brown-Johnson could not have used ExpressVPN more than 13,000 times during the brief period reflected in Instructure's own screenshot.

63. On information and belief, if ExpressVPN was present on the computer at all, it was already there when Instructure issued Ms. Brown-Johnson the computer—a previously used device—in November 2022.

64. If ExpressVPN was on Ms. Brown-Johnson's work-computer, Instructure has no evidence that Ms. Brown-Johnson is the person who installed ExpressVPN.

65. On information and belief, Instructure's device-management software would have flagged installation of software violating Company policy.

66. If ExpressVPN was present on Ms. Brown-Johnson's computer, Instructure knew or should have known that ExpressVPN was present on the computer for months or years, yet raised no concern about it until after Ms. Brown-Johnson returned to work following her exercise of rights under the ADAAA and the FMLA.

67. Instructure separately faulted Ms. Brown-Johnson for the presence of the Roblox application on her computer. Ms. Brown-Johnson did not intentionally download Roblox and has no knowledge of its presence (or lack of) on her work computer.

68. Instructure requires its employees to use their personal Apple IDs on Company-issued computers and specifically instructs departing employees to log out of their personal Apple ID and iCloud accounts upon separation—an acknowledgment that personal applications can become associated with Company computers through an employee's personal Apple ID without any intentional act by the employee.

69. On information and belief, to the extent Roblox was present on Ms. Brown-Johnson's computer at all, because of Instructure's device management software, Instructure knew

or should have known of it, and Instructure used it, like the alleged VPN, as a pretext to terminate Ms. Brown-Johnson's employment.

70. On September 30, 2025, Instructure terminated Ms. Brown-Johnson's employment, citing an unspecified "serious violation of our Company Security Policy" without identifying the incident or the conduct that allegedly violated any policy. Instructure's stated reason was false and pretextual.

**Harm**

71. As a direct and proximate result of Instructure's unlawful conduct, Ms. Brown-Johnson has suffered and continues to suffer significant economic and non-economic harm, including lost wages, lost benefits, lost stock compensation, back pay, front pay, emotional distress, mental anguish, humiliation, and loss of the quality and enjoyment of life.

**COUNT I**
**FAILURE TO ACCOMMODATE**
**In Violation of the ADAAA, 42 U.S.C. § 12112(b)(5)(A)**

72. Ms. Brown-Johnson incorporates by reference all preceding paragraphs as if fully set forth herein.

73. At all relevant times, Ms. Brown-Johnson was a qualified individual with a disability within the meaning of the ADAAA.

74. Instructure had notice of Ms. Brown-Johnson's disability and of her need for reasonable accommodation, including the captioning and transcription software and the requested change to a 7:00 a.m. to 3:00 p.m. schedule.

75. The accommodations Ms. Brown-Johnson requested were reasonable and would not have imposed an undue hardship on Instructure. Indeed, Instructure was simultaneously soliciting volunteers to work the very schedule Ms. Brown-Johnson requested.

76. Instructure violated the ADAAA, 42 U.S.C. § 12112(b)(5)(A), by failing to provide reasonable accommodations, by unreasonably delaying and denying the requested schedule accommodation, and by failing to engage in the interactive process in good faith.

77. As a direct and proximate result of Instructure's conduct, Ms. Brown-Johnson has suffered the damages described above.

**COUNT II**
**DISCRIMINATORY DISCHARGE**
**In Violation of the ADAAA, 42 U.S.C. § 12112**

78. Ms. Brown-Johnson incorporates by reference all preceding paragraphs as if fully set forth herein.

79. Ms. Brown-Johnson was a qualified individual with a disability who could perform the essential functions of her position with or without reasonable accommodation.

80. Instructure terminated Ms. Brown-Johnson's employment on March 6, 2025, and again on September 30, 2025, because of her disability and her need for reasonable accommodation.

81. Instructure's stated reasons for the terminations were false and pretextual.

82. Instructure discriminated against Ms. Brown-Johnson in the terms, conditions, and privileges of her employment because of her disability, in violation of the ADAAA, 42 U.S.C. § 12112.

83. As a direct and proximate result of Instructure's conduct, Ms. Brown-Johnson has suffered the damages described above.

**COUNT III**
**HOSTILE WORK ENVIRONMENT**
**In Violation of the ADAAA, 42 U.S.C. § 12101 et seq.**

84. Ms. Brown-Johnson incorporates by reference all preceding paragraphs as if fully set forth herein.

85. Ms. Brown-Johnson was subjected to unwelcome harassment because of her disability and her need for the captioning and transcription accommodation.

86. The harassment—including Tate Dehaan's persistent hostility, criticism, impatience with her accommodation, micromanagement, and the imposition of different standards on her—was sufficiently severe or pervasive to alter the terms and conditions of Ms. Brown-Johnson's employment and to create an abusive working environment.

87. Instructure knew or should have known of the harassment and failed to take prompt and effective remedial action, including by ignoring Ms. Brown-Johnson's April 10, 2025 request for alternate supervision and delaying the remedial action.

88. Instructure's conduct violated the ADAAA.

89. As a direct and proximate result of Instructure's conduct, Ms. Brown-Johnson has suffered the damages described above.

**COUNT IV**
**RETALIATION**
**In Violation of the ADAAA, 42 U.S.C. § 12203(a)**

90. Ms. Brown-Johnson incorporates by reference all preceding paragraphs as if fully set forth herein.

91. Ms. Brown-Johnson engaged in protected activity, including requesting reasonable accommodations for her disability and filing charges of discrimination with the EEOC.

92. Instructure took materially adverse actions against Ms. Brown-Johnson because of her protected activity, including refusing her accommodations, subjecting her to heightened scrutiny and micromanagement, wiping and locking down her computer and revoking her access to company systems, denying her the promised training, and terminating her employment on March 6, 2025, and September 30, 2025.

93. A causal connection exists between Ms. Brown-Johnson's protected activity and the adverse actions, including their close temporal proximity.

94. Instructure's stated reasons for the adverse actions were false and pretextual.

95. Instructure retaliated against Ms. Brown-Johnson in violation of the ADAAA, 42 U.S.C. § 12203(a).

96. As a direct and proximate result of Instructure's conduct, Ms. Brown-Johnson has suffered the damages described above.

**COUNT V**
**FMLA INTERFERENCE**
**In Violation of the FMLA, 29 U.S.C. § 2615(a)(1)**

97. Ms. Brown-Johnson incorporates by reference all preceding paragraphs as if fully set forth herein.

98. At all relevant times, Ms. Brown-Johnson was an eligible employee, and Instructure was a covered employer, within the meaning of the FMLA.

99. Ms. Brown-Johnson was entitled to FMLA leave because of her own serious health condition, and she had previously exercised her FMLA rights.

100. Ms. Brown-Johnson gave Instructure notice of her need for FMLA leave and repeatedly requested information regarding the amount of FMLA leave available to her.

101. Instructure interfered with, restrained, and denied the exercise of Ms. Brown-Johnson's FMLA rights by, among other things, failing to respond to her repeated requests for information about her available leave, failing to provide the notices of FMLA rights and eligibility required by law, mishandling and miscommunicating the amount and duration of her available leave, keeping her out of work and unpaid while failing to act on her leave and accommodation requests, and terminating her employment.

102. Instructure's interference prejudiced Ms. Brown-Johnson, who lost wages and benefits and suffered other harm as a result.

103. Instructure's conduct violated the FMLA, 29 U.S.C. § 2615(a)(1), and was not in good faith, entitling Ms. Brown-Johnson to liquidated damages under 29 U.S.C. § 2617.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Sharlene Brown-Johnson respectfully requests that this Court enter judgment in her favor and against Defendant Instructure, Inc., and award the following relief:

(a) A declaratory judgment that Instructure's actions, conduct, and practices complained of herein violated the ADAAA and the FMLA;

(b) A permanent injunction restraining Instructure from engaging in the unlawful conduct alleged herein;

(c) Reinstatement of Ms. Brown-Johnson to her position, or, in lieu thereof, front pay and the value of lost future earnings and benefits;

(d) Back pay, lost wages, lost stock compensation, and lost benefits, with prejudgment and post-judgment interest;

(e) Compensatory damages for Ms. Brown-Johnson's pecuniary and non-pecuniary losses, including emotional distress, mental anguish, humiliation, and loss of the quality and enjoyment of life, in amounts to be proven at trial;

(f) Punitive damages under the ADAAA in an amount sufficient to punish Instructure and deter such conduct in the future;

(g) On the FMLA claim, damages for lost wages, salary, benefits, and other compensation, together with an equal additional amount as liquidated damages, and interest, pursuant to 29 U.S.C. § 2617;

(h) Reasonable attorneys' fees, expert fees, and costs of this action; and

(i) Such other and further relief as this Court deems just and proper.

**JURY DEMAND**

Plaintiff Sharlene Brown-Johnson demands a trial by jury on all claims and issues so triable.

Dated this 24th day of August, 2026.

Respectfully submitted,

/s/ Kass Harstad
Kass Harstad (Bar No. 11012)
Birch Hallam Harstad & Johnson, LLC
1516 W Hays St., Boise, ID 83702
kass@idahojobjustice.com

HOULDING LAW (NY Bar No. 3984531)
(pro hac pending)
431 Classon Avenue, Suite 1B
Brooklyn, New York 11238
rebecca@houldinglaw.com

*Attorneys for Plaintiff Sharlene Brown-Johnson*